UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

CHAD L. ANDERSON,

    Plaintiff,

v.

EXPERIAN INFORMATION SOLUTIONS, INC., and EMC MORTGAGE CORPORATION,

    Defendants.

Case No. 08-CV-5151 (PJS/JJK)

ORDER GRANTING DEFENDANT EMC MORTGAGE CORPORATION'S MOTION FOR SUMMARY JUDGMENT

---

    Bryan R. Battina, BOCK & BATTINA, LLP, for plaintiff.

    Monica L. Davies and Troy M. Parrish, LEONARD, STREET AND DEINARD, for defendant EMC Mortgage Corporation.

    Plaintiff Chad Anderson brings a claim under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq., against defendant EMC Mortgage Corporation ("EMC").[1] This matter is before the Court on EMC's motion for summary judgment. For the reasons set forth below, EMC's motion is granted.

I.  BACKGROUND

    EMC holds a second mortgage on Anderson's home. Anderson Aff. ¶ 4. Anderson's mortgage payments are due on the first day of each month. *See* Battina Aff. Ex. A. Anderson

---

[1] Anderson previously stipulated to the dismissal of his claims against defendants Trans Union LLC and Michael Barnett. Docket Nos. 15, 41. Although the complaint does not clearly indicate which of his remaining claims are asserted against EMC, Anderson has clarified that he is pursuing only an FCRA claim against EMC. Anderson Dep. 106-07; Davies Aff. ¶ 3. The claims against the other remaining defendant, Experian Information Solutions, Inc., are not before the Court at this time.

generally makes his mortgage payments every month, although his practice is to submit each payment a few days after it is due.

Anderson's December 2006 mortgage payment was due on December 1, 2006. Consistent with his general practice, Anderson mailed a check to EMC on December 5, 2006. Anderson Aff. ¶ 8; Webb Aff. Ex. A.  EMC credited the December payment to Anderson's account a few days later.  Anderson Aff. ¶ 9.

Somehow, though, Anderson's check was lost or destroyed after it was credited to his account but before EMC actually presented the check to Anderson's bank for payment.  *See* Webb Aff. Ex. A (copy of check stating "[t]his is a photographic facsimile of the original check which has been reported lost, stolen or destroyed while in transit").  In March 2007 — more than three months after Anderson submitted the original check to EMC — EMC presented a *substitute* check to Anderson's bank.  *See* Webb Aff. Ex. A.  A substitute check is essentially a photocopy of the front and back of the original check with some information added; under federal law, a substitute check is the legal equivalent of the original check.[2]

Unfortunately, though, after Anderson submitted the original December 2006 check to EMC but before EMC presented the substitute check to his bank, Anderson closed the account on which the December 2006 check was drawn.  Anderson Aff. ¶ 27.  As a result, Anderson's bank

---

[2]In 2003, Congress enacted the "Check Clearing for the 21st Century Act," 12 U.S.C. §§ 5001-5018, which created a new type of negotiable instrument called a "substitute check." *See* 12 U.S.C. § 5002(6), (16) (defining "substitute check" and defining "check" to include substitute checks).  Under the Act, a substitute check is the legal equivalent of the original check for all purposes.  12 U.S.C. § 5003(b).  Anderson does not dispute that a substitute check should be treated as the equivalent of the original check.  More particularly, Anderson does not contend that Minn. Stat. §§ 336.3-310(b)(4) and 336.3-309, which limit the rights of a payee when a check is lost, stolen, or destroyed, are applicable in this case.

returned the check unpaid to EMC on March 14, 2007 with the notation "Closed Account." Webb Aff. ¶ 3 & Ex. A. EMC then "un-credited" the December payment, and Anderson's account become delinquent — that is, Anderson fell one payment behind. On April 5, 2007, EMC reported Anderson's account as thirty days past due to Experian and other consumer-reporting agencies.[3] Webb Aff. ¶ 5.

EMC called Anderson at some point in April. According to Anderson (whose version of the facts must be accepted), EMC did not tell Anderson about the problem with his December check, nor did EMC tell him that his account was thirty days past due. Rather, EMC told Anderson that his *April* payment was late. Anderson Dep. 6, 17. This confused Anderson, as he knew that he had made his April payment. Anderson provided EMC with a copy of his April check. Anderson Dep. 19. EMC, however, continued to insist that Anderson had missed his April payment, which Anderson knew was not true. Anderson Dep. 17-18, 20-21.

Anderson provided EMC with additional copies of his April check, Anderson Dep. 15-16, and he tried to get help from a series of EMC customer-service representatives, none of whom made any attempt to figure out the source of the problem. Anderson Dep. 17, 23-24, 41. As April turned to May, EMC informed Experian and the other consumer-reporting agencies that Anderson's account remained thirty days past due. Webb Aff. ¶ 6. Later in May, to avoid further damage to his credit, Anderson made an "extra" mortgage payment to bring his account up-to-date. Anderson Dep. 16, 22-23.

---

[3] EMC says that it did not report Anderson's account as delinquent until April 2007, while Anderson says that EMC may have reported his account as delinquent as early as February 2007. Blackfelner Aff. ¶ 12. The dispute is not material, however, because Anderson's account was in fact delinquent as of January 2007, as discussed below.

Anderson eventually pieced together what had happened with his December 2006 check and realized that the reason that his account fell thirty days behind was not — as EMC had repeatedly insisted — because he had missed his April 2007 payment, but because his December 2006 check had bounced after he closed his account. Anderson Dep. 27. Unfortunately, though, the damage to Anderson's credit rating had already been done. And that damaged credit rating was to have substantial consequences:

Anderson's dispute with EMC coincided with his attempt to purchase an expensive cabin (along with some undeveloped parcels of real estate). Anderson Aff. ¶¶ 12-13. Because EMC twice reported his account as thirty days late, Anderson's credit score dropped, and because Anderson's credit score dropped, Anderson was unable to obtain a mortgage. Blackfelner Aff. ¶¶ 12-13. With the help of his real-estate agent, Anderson arranged for third parties to purchase the cabin and sell it back to him on a short-term contract for deed.[4] Anderson Aff. ¶ 21. The purpose of structuring the transaction in this manner was to give Anderson time to clean up his credit report. Anderson Dep. 40; Blackfelner Aff. ¶¶ 15-18. That strategy was unsuccessful, however, and Anderson was not able to obtain a loan to perform on the contract for deed. Anderson Aff. ¶ 31. As a result, the third parties put the cabin up for sale, and Anderson lost not only the payments that he had made on the contract for deed, but also the increased value of the property — a financial benefit that he, rather than the third parties, would have enjoyed if EMC's

---

[4]Because the contract for deed was signed in March, EMC argues that its April and May reports could not be the reason Anderson was unable to obtain a conventional mortgage. As noted above, however, Anderson has offered evidence that EMC reported a delinquency in his account as early as February.

reports about the delinquency of his account had not made it impossible for him to get a mortgage. Anderson Dep. 46 & Ex. 8 at 3.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for either party. *Ohio Cas. Ins. Co. v. Union Pac. R.R.*, 469 F.3d 1158, 1162 (8th Cir. 2006). In considering a motion for summary judgment, a court "must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party." *Winthrop Res. Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 468 (8th Cir. 2004).

### B. FCRA

Anderson brings a claim under 15 U.S.C. § 1681s-2(b), which imposes certain duties on persons and entities (like EMC) who furnish information to consumer-reporting agencies (like Experian).[5] Section 1681s-2(b) states, in relevant part:

---

[5] A "consumer-reporting agency" is "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f).

>After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall —
>
>>(A) conduct an investigation with respect to the disputed information;
>>
>>(B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;
>>
>>(C) report the results of the investigation to the consumer reporting agency;
>>
>>(D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and
>>
>>(E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly —
>>
>>>(i) modify that item of information;
>>>
>>>(ii) delete that item of information; or
>>>
>>>(iii) permanently block the reporting of that item of information.

The FCRA allows an aggrieved consumer to recover actual damages and attorney's fees for violations of § 1681s-2(b).  *See* 15 U.S.C. § 1681o(a); *see also Gorman v. Wolpoff & Abramson, LLP*, No. 06-17226, 2009 WL 3365928, at *4 (9th Cir. Oct. 21, 2009).

Critically, the duties imposed by § 1681s-2(b) on a furnisher of information are triggered only when the furnisher "receiv[es] notice pursuant to section 1681i(a)(2)." Notice received pursuant to § 1681i(a)(2) is notice received from a *consumer-reporting agency*, not notice received from a *consumer*. Thus, as Anderson concedes, EMC was not required to investigate the accuracy of its reports about his account until September 2007, when EMC learned for the first time from a consumer-reporting agency (rather than from Anderson) that Anderson was disputing the accuracy of the information reported by EMC. *Gorman*, 2009 WL 3365928, at *4.

Anderson claims that, after EMC was told by the consumer-reporting agency that Anderson denied that his account had ever been thirty days past due, EMC was required under § 1681s-2(b) to delete that information, because it knew that the information was inaccurate. EMC counters that Anderson's December 2006 check bounced and that Anderson did not make up the shortfall caused by the bounced check until late May 2007. Therefore, says EMC, its April 2007 and May 2007 reports that Anderson's account was thirty days past due were accurate, and § 1681s-2(b) did not require EMC to correct those reports.

1. Whether Anderson's Account Was Ever Delinquent

Anderson contends that he was never thirty days late on his EMC account for two reasons. First, under the Uniform Commercial Code, payment by check suspends a debt obligation until the check is either paid or dishonored. Minn. Stat. § 336.3-310(b)(1).[6] As a result, Anderson argues, the period between December 5, 2006 (the date of the check) and

---

[6] EMC did not object to Anderson's reliance on Minnesota law. The Court therefore assumes, without deciding, that to the extent state law is relevant in determining the legal consequences of the parties' actions, Minnesota law is controlling. The Court also relies on cases from other jurisdictions as persuasive authority.

March 13, 2007 (the date that the check was dishonored) should not be counted against him. Moreover, because Anderson made a mortgage payment on April 6 — and because April 6 was less than thirty days after his December payment obligation was reinstated on March 13 — EMC was wrong when it reported his account as thirty days past due on April 5. Thereafter, Anderson argues, EMC could not truthfully say that his account was more than thirty days late unless more than thirty days passed without a mortgage payment from him.[7]

The Court rejects this argument. Many courts have held that, when a check is *paid*, the *payment* relates back to the time the check was tendered. *See Wayzata Enters., Inc. v. Herman*, 128 N.W.2d 156, 158 (Minn. 1964) ("Upon payment of the check, the debt is deemed to have been discharged when the check was given."); *Long v. Cuttle Constr. Co.*, 70 Cal. Rptr. 2d 698, 699-700 (Cal. Ct. App. 1998) (postjudgment interest ceased to accrue upon judgment creditors' acceptance of checks even though bank placed a five-day hold on the checks); *Aztec Gas & Oil Corp. v. Roemer Oil Co.*, 948 P.2d 902, 904 (Wyo. 1997) ("payment by check does not discharge a debt unless and until the check is honored; once honored, the time of payment relates back to the time the check is delivered"). This makes sense, as a party who accepts a check in lieu of cash implicitly agrees that, once the check is paid, the party will treat the check as if it had been cash all along.

But this implicit agreement rests on the assumption that the check will be *honored*. When that assumption proves wrong, it does not make sense to consider the underlying debt suspended for the period of time between the delivery of the bad check and its dishonor by the

---

[7]As Anderson cannot help but acknowledge, even by this logic his account was more than thirty days delinquent as of May 7. At that point, it had been more than thirty days since his last mortgage payment on April 6.

bank. An agreement to treat a good check as though it were cash is a far cry from an agreement to waive the right to timely payment if a bad check is presented. Put another way, if payment of a check relates back to the date of tender, then by the same token the *failure* of payment also relates back to the date of tender. *See Merriman v. Sandeen*, 267 N.W.2d 714, 718 (Minn. 1978) ("Upon dishonor of the check, payment failed. If the check had been processed through banking channels and had been dishonored, its dishonor several days later would certainly have constituted failure of payment relating back to the day of tender."); *Assoc. Bank v. Larscheid*, No. A06-1557, 2007 WL 2177799, at *2 (Minn. Ct. App. July 31, 2007) ("the undisputed evidence shows that appellant's obligation was not suspended because dishonor had occurred"); *Hakakha v. Quality of Life Health Corp.*, No. B192716, 2008 WL 4276478, at *3 (Cal. Ct. App. Sept. 18, 2008) ("[Section 3-310] does not address or override the parties' intentions and expectations about what constitutes timely payment. 'Payment' by an insufficient funds check could not have been contemplated by the Note's detailed provisions regarding time of payment and the consequences of its failure."); *Aztec Gas & Oil Corp.*, 948 P.2d at 905 ("Aztec's fifth payment check did not cure default because a dishonored check does not constitute legal tender").

The Court therefore holds that, because the December 2006 check was ultimately dishonored, the December 2006 payment obligation was not suspended during the period of time between the date that Anderson submitted the check and the date that Anderson's bank dishonored it. As Anderson's December 2006 payment was due on December 1, 2006, Anderson's account became thirty days past due on December 31, 2006, and his account remained thirty days past due when reported as such by EMC in April 2007 and May 2007.

Anderson's second argument rests on the fact that EMC failed to present his December check for payment within ninety days of its date. Under the UCC, a check becomes overdue ninety days after its date. *See* Minn. Stat. § 336.3-304(a)(2). Thus, Anderson argues, EMC's failure to present the check for payment within ninety days relieved Anderson of all liability on the check. *See Goblirsch v. Heikes*, 547 N.W.2d 89, 92-93 (Minn. Ct. App. 1996) (failure to present check within reasonable period of time relieved drawer of liability on the check).[8] Although Anderson does not pursue this argument to a conclusion, presumably he means to suggest that (1) the dishonor of the check after the ninety-day period should be ignored (because at that point he had no more liability on the check) and (2) the suspension of his obligation to pay on the underlying debt (which suspension was triggered by his tender of the check) should last until EMC requests a new check or otherwise gives him some kind of notice that it failed to present the check within the ninety-day period — something that EMC did not do for many months, if ever.

---

[8] In *Goblirsch*, the holder failed to present the check for over five years. *Goblirsch*, 547 N.W.2d at 92. At the time, the applicable UCC provision stated that presentment within thirty days is "presumed" to be reasonable. *Id*. The UCC has since been amended, however, to state that a check "becomes" overdue ninety days after its date. Minn. Stat. § 336.3-304(a). Although the Court need not resolve this issue, this change in the statutory language suggests that failure to present for more than ninety days is now per se unreasonable and will always relieve the drawer of liability on the instrument. *See* 2 James J. White & Robert S. Summers, *Uniform Commercial Code* § 17-7 at 203 (5th ed. 2008) ("The good news is that a party can now take a check up to 90 days after its issue; the bad news is that the 90 day cutoff appears to be more than a presumption. The Code simply states that a check becomes 'overdue,' and is no longer merely 'presumed to be' overdue.").

Anderson's argument might have some force if he had maintained sufficient funds in his account to cover the check for at least ninety days.  But he did not.  Instead, Anderson closed his account without first making certain that all of the checks he had written on the account during the past ninety days had cleared.  Although it is not clear exactly when Anderson closed the account, it is clear that Anderson closed the account before the end of the ninety-day period.[9]  Under the UCC, presentment is excused when "the drawer or endorser whose obligation is being enforced . . . has no reason to expect or right to require that the instrument be paid or accepted . . . ."  Minn. Stat. § 336.3-504(a)(iv).  Where a drawer fails to maintain sufficient funds in the account to pay the check for a reasonable period of time, the check has in essence been dishonored, even *without* presentment.  *Cf. Olsen v. Preferred Risk Mut. Ins. Co.*, 170 N.W.2d 581, 584 (Minn. 1969) (holding that plaintiff's failure to keep sufficient funds in his account during the time in which presentment would have been reasonable was not an effective payment); *Merriman*, 267 N.W.2d at 717 ("*Olsen* stated that dishonor of a check used to pay an insurance premium would cause the policy to lapse. . . . [T]he policy lapsed because the plaintiff failed to have sufficient funds in his account for a reasonable period of time, notwithstanding the fact that the check was apparently lost in the mail."); *Aztec Gas & Oil Corp.*, 948 P.2d at 904-05 (drawer may not unilaterally alter the UCC's ninety-day period for presentment).  Moreover, as the

---

[9]At his deposition, Anderson initially testified that he closed the account.  Anderson Dep. 9.  Later, he testified that the account is still open but has only one cent in it (which led him to ponder why his overdraft protection did not cover his December check).  Anderson Dep. 253, 269.  In his affidavit and brief, though, Anderson does not dispute that he closed the account, which is consistent with the notation on the dishonored check.  As for the timing of the closure, Anderson could not remember a specific date but testified that it "might have been a month after this," by which he seemed to mean the December check to EMC.  Anderson Dep. 9.  At any rate, the ninety-day period expired only about a week before EMC presented the check, and Anderson has never claimed that he closed the account within that final week.

drawer, Anderson was not entitled to notice that his check was dishonored. *See* Minn. Stat. § 336.3-503 cmt. 1 ("notice of dishonor is no longer relevant to the liability of a drawer except for the case of a draft accepted by an acceptor other than a bank"); Minn. Stat. § 336.3-409(a) ("'Acceptance' means the drawee's signed agreement to pay a draft as presented.").

In short, when Anderson closed his account before the end of the ninety-day period for presentment of the December 2006 check, Anderson's check was dishonored at that point, and the dishonor related back to the date that the check was tendered. As a result, EMC's April 2007 and May 2007 reports of a thirty-day delinquency in Anderson's account were true.[10]

2. Number of Missed Payments

Anderson next argues that, even if it is true that his account was delinquent, EMC nevertheless reported inaccurate information to Experian and other consumer-reporting agencies. According to Anderson, EMC reported that he had missed two payments. In fact, says Anderson, he missed only one payment — the December 2006 payment — and that one missed payment simply remained "missed" during both April 2007 and May 2007. EMC counters that it did not report that Anderson missed two payments; instead, says EMC, it reported that Anderson's account was short one month's payment for two successive months, which it was.

---

[10]Likewise, the factual dispute over whether EMC reported a delinquency in February 2007 or March 2007 is irrelevant because any such report would have been true. Anderson's account was thirty days past due as of December 31, 2006, and remained thirty days past due until late May 2007.

Having reviewed Anderson's credit report, the Court agrees with EMC.[11] The information about Anderson's EMC account reflects entries from two credit bureaus — Equifax and Experian. Battina Aff. Ex. G. Under "Days Past Due 30/60/90+," the entries for both Equifax and Experian state "2." Battina Aff. Ex. G. Under "24 Month History," the entry for Equifax shows thirty-day delinquencies in April and May; the entry for Experian shows thirty-day delinquencies in May and June.[12] The reference key for "Days Past Due 30/60/90+" states that this entry is intended to communicate "the number of times an *account* was overdue 30, 60 or 90 days within the past seven years." Battina Aff. Ex. G (emphasis added). Similarly, the reference key for "24 Month History" states that this entry "[i]ndicates whether *the account* was current or past due on a month-to-month basis . . . ." Battina Aff. Ex. G (emphasis added).

In short, it is clear that both Equifax and Experian reported not that Anderson had missed two payments to EMC, but instead that Anderson's EMC account was short by one month's payment for two successive months. That information was accurate. Because EMC accurately reported that Anderson's account was delinquent by one month's payment for two successive months, and because Anderson has not suggested that he suffered any damages from the fact that

---

[11]Section 1681s-2(b) refers to "the completeness or accuracy of any information provided by a person *to* a consumer reporting agency" (emphasis added), not the completeness or accuracy of information reported *by* the consumer reporting agency. But the parties have treated the information in Anderson's credit report (Exhibit G to the affidavit of Bryan Battina) as the equivalent of the information reported by EMC, so the Court will do likewise. Moreover, at oral argument, Anderson specifically referred the Court to the report's reference key.

[12]Obviously, the Experian entry is inaccurate insofar as it states that Anderson's account was delinquent in May and June (as opposed to April and May). But the same entry makes clear that there were two successive months of delinquency, not three. Anderson has not offered any evidence that he suffered any damages attributable to this minor discrepancy.

the Experian entry inaccurately identifies those months as May and June rather than as April and May, EMC's motion for summary judgment is granted.[13]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Defendant EMC Mortgage Corporation's motion for summary judgment [Docket No. 47] is GRANTED.

2. Plaintiff's claim against defendant EMC Mortgage Corporation is DISMISSED WITH PREJUDICE AND ON THE MERITS.

Dated: November 2, 2009

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge

---

[13]The Court also notes that, even if Anderson's credit report should contain only one entry for a late payment that grew older over time, Anderson has not shown that he suffered damages attributable to the difference between what the report actually says and what Anderson believes it should say.